UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAYLA WOODS,
Individually,

Plaintiff,

v.

CASE NO.

JURY DEMAND

AURORA ON THE LAKE LLC,
a Michigan Limited Liability Company,
ORCHARD HOSPITALITY LLC,
a Michigan Limited Liability Company, and
BARBAT HOLDINGS LLC d/b/a
PRIME CONCEPTS DETROIT,
a Michigan Limited Liability Company,

Defendants.
_______________________________________/

WARREN D. ASTBURY
ASTBURY LAW, PLLC
Michigan Bar # P82416
Attorney for Plaintiff
607 Shelby St.
7th Floor, #1115
Detroit, MI 48226
Tel: (313) 701-2448
warren@astburylegal.com

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Kayla Woods ("Kayla"), brings this action and Complaint for damages and demand for jury trial against Defendants, Aurora On the Lake LLC,

Orchard Hospitality LLC, and Barbat Holdings LLC d/b/a Prime Concepts Detroit (collectively, "Defendants"), and, in support thereof, alleges as follows:

## PARTIES

1. Plaintiff Kayla Woods ("Kayla") is a citizen of the State of Michigan, residing in Livingston County.

2. Kayla was an "employee" of Defendants as that term is defined by Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.

3. Kayla was an "employee" of Defendants as that term is defined by Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), MCL § 37.2101 et seq.

4. Defendant Aurora On the Lake LLC is a Michigan limited liability company, with its principal place of business located in Oakland County, Michigan.

5. Defendant Orchard Hospitality LLC is a Michigan limited liability company, with its principal place of business located in Oakland County, Michigan.

6. Defendant Barbat Holdings LLC is a Michigan limited liability company, with its principal place of business located in Oakland County, Michigan.

7. Defendant Barbat Holdings LLC conducts business under the assumed name Prime Concepts Detroit.

8. Defendants, individually and as a single integrated enterprise, employed fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year.

9. Each Defendant was an "employer" of Kayla as that term is defined by Title VII, 42 U.S.C. § 2000e(b).

10. Each Defendant was an "employer" of Kayla as that term is defined by the ELCRA, MCL § 37.2201(a).

11. Defendants operate as a single, integrated enterprise.

12. Defendants share common ownership and common financial control.

13. Defendants share common management.

14. Defendants maintain centralized control of labor relations and personnel, including a single human resources function.

15. Defendants maintain interrelated operations, including a shared point-of-sale and timekeeping system, a shared corporate address, and the routine transfer of employees among locations.

16. Defendants were, at various times, joint employers of Kayla.

**JURISDICTION**

17. The Court has original jurisdiction over Kayla's Title VII claim pursuant to 28 U.S.C. § 1331.

18. This Court has supplemental jurisdiction of Kayla's ELCRA claim pursuant to 28 U.S.C. § 1367, as this claim is so related to Kayla's Title VII claim that it forms part of the same case or controversy.

19. This Court has jurisdiction to grant injunctive and declaratory equitable relief as well as damages invoked pursuant to the statutes cited above, as well as Ex Parte Young, 209 U.S. 123 (1908), pursuant to Plaintiff's request for prospective injunctive relief, and the authority to grant declaratory relief under the statutes cited above.

**VENUE**

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred within the Southern Division of the Eastern District of Michigan.

21. Defendants conduct substantial and not isolated business within the Southern Division of the Eastern District of Michigan.

22. Defendants have agents and employees in the Southern Division of the Eastern District of Michigan.

23. Defendants have businesses located in the Southern Division of the Eastern District of Michigan.

**CONDITIONS PRECEDENT**

24. On or about May 22, 2026, Kayla filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Michigan Department of Civil Rights, assigned Charge No. 471-2026-05645.

25. That charge named Aurora On the Lake LLC and Barbat Holdings LLC/Prime Concepts Detroit as respondents.

26. Upon information and belief, Defendant Orchard Hospitality LLC received actual notice of that charge through its common ownership, common management, and common human resources function with the named respondents.

27. Defendant Orchard Hospitality LLC shares an identity of interest with the respondents named in that charge.

28. That charge was filed within three hundred (300) days of the unlawful employment practices alleged herein.

29. On or about August 13, 2026, the EEOC issued Kayla a Determination and Notice of Rights regarding this matter.

30. Plaintiff files this action within ninety (90) days of receipt of the Determination and Notice of Rights.

31. Plaintiff files this action within the applicable statute of limitations.

32. All conditions precedent to this action have been satisfied and/or waived.

## FACTUAL BACKGROUND

33. In or about late July 2024, Kayla began working as a server at Aurora Italiana in West Bloomfield, Michigan.

34. Aurora Italiana in West Bloomfield issued Kayla's wage statements under the entity name Orchard Hospitality LLC.

35. On or about July 17, 2025, manager Zoran contacted Kayla regarding employment at Aurora On the Lake in Commerce Township, Michigan.

36. Zoran informed Kayla that her rehire required clearance from human resources.

37. Zoran informed Kayla that human resources had approved her rehire.

38. On or about July 18, 2025, Kayla began working as a server at Aurora On the Lake.

39. Aurora On the Lake issued Kayla's wage statements under the entity name Aurora On the Lake LLC.

40. Defendants' employee handbook bears the name "Prime Concepts."

41. The wage statements issued by Orchard Hospitality LLC list its address as 7499 Middlebelt Road, West Bloomfield, Michigan.

42. The wage statements issued by Aurora On the Lake LLC list its address as 7499 Middlebelt Road, West Bloomfield, Michigan.

43. Defendant Barbat Holdings LLC conducts business from 7499 Middlebelt Road, West Bloomfield, Michigan.

44. Human resources representative Erica Boyd ("Erica") held the title "Prime Talent Acquisition" and used an email address at the domain primeconceptsdetroit.com.

45. Erica performed human resources functions for Aurora Italiana and for Aurora On the Lake.

46. Kayla used the same employee number in Defendants' point-of-sale and timekeeping system at Aurora Italiana and at Aurora On the Lake.

47. Kayla was employed by Defendants for approximately seventeen (17) months.

48. During those seventeen (17) months, Kayla received no verbal warning.

49. During those seventeen (17) months, Kayla received no written warning.

50. During those seventeen (17) months, Kayla received no disciplinary action of any kind.

51. During her employment, Kayla received positive feedback from managers regarding her job performance.

52. During her employment, Kayla received positive feedback from guests regarding her job performance.

53. Kayla was the longest-tenured full-time server at Aurora On the Lake.

54. Kayla was qualified for the position of server.

55. Kayla performed the essential functions of her position.

56. In or about late July or early August 2025, Cheri began working as the General Manager of Aurora On the Lake.

57. General Manager Cheri praised Kayla's job performance.

58. General Manager Cheri assigned Kayla to train other servers.

59. General Manager Cheri asked Kayla to train other servers during pre-shift meetings.

60. General Manager Cheri did not ask any other server to train staff during pre-shift meetings.

61. In or about late July or early August 2025, Jozef Berishaj ("Joe") began working as a server at Aurora On the Lake.

62. Kayla trained Joe.

63. During that training, Kayla advised management that Joe was not ready to serve.

64. Joe is the cousin of Jeton Berisha ("Jeton"), a manager at Aurora On the Lake.

65. In or about August 2025, Joe stated to coworkers, in substance, that "13-year-olds are the perfect age."

66. Joe repeated statements of that nature on multiple occasions.

67. Multiple employees told Joe that such statements were inappropriate and unwelcome.

68. Joe continued to make statements of that nature notwithstanding those objections.

69. Joe expressed sexual attraction to a fifteen (15) year-old host employed at the restaurant.

70. Joe commented on the physical appearance of that fifteen (15) year-old host.

71. Joe stated that he selected his work shifts so that he could be present when that minor was scheduled.

72. Joe was permanently barred from the café area of the restaurant for sexually harassing two (2) minor employees.

73. Management was informed that Joe had been barred from the café area for sexually harassing two (2) minor employees.

74. Female employees other than Kayla reported Joe's sexually harassing conduct to management.

75. Female employees other than Kayla reported Joe's sexually harassing conduct to human resources.

76. In or about late September or early October 2025, Joe approached Kayla in the server station and stated, without prompting, "I have erectile dysfunction."

77. Later that evening, Kayla told Joe that she did not need to know about this.

78. Later that evening, Joe continued for several minutes to describe in graphic detail his inability to maintain an erection.

79. Multiple employees overheard that exchange.

80. Later that month, Joe initiated an unsolicited conversation with female coworkers, including Kayla, regarding his sexual "conquests."

81. During that conversation, Kayla stated that she was uninterested and uncomfortable with the topic.

82. Joe continued the conversation in detail notwithstanding that statement.

83. Kayla reported the erectile dysfunction incident to General Manager Cheri immediately after it occurred.

84. From August 2025 through mid-October 2025, Kayla reported Joe's sexually inappropriate conduct to management on approximately fifteen (15) to twenty (20) occasions.

85. Each of those reports was an act of opposition to sexual harassment.

86. In response to one such report, General Manager Cheri told Kayla that she had not hired Joe and therefore could not fire him.

87. Defendants did not investigate any of those reports.

88. Defendants did not interview any witness concerning any of those reports.

89. Defendants did not discipline Joe in response to any of those reports.

90. On or about October 22, 2025, Joe made repeated sexual remarks about the body of a female guest seated at table 5.

91. Later that evening, Joe explicitly described to coworkers what he would do to that guest.

92. Joe made those remarks on the restaurant floor and within earshot of other guests and employees.

93. Kayla witnessed those remarks.

94. On or about October 27, 2025, coworkers asked Kayla to escalate concerns about Joe's conduct to upper management.

95. Those coworkers asked Kayla to escalate because management had not stopped Joe's conduct.

96. Kayla escalated concerns regarding Joe's conduct directly to Lee Sharkas, an owner of Aurora On the Lake.

97. That escalation was an act of opposition to sexual harassment.

98. General Manager Cheri and manager Craig summoned Kayla to the private dining room.

99. Cheri and Craig told Kayla that she had caused a “ruckus” with upper management and ownership.

100. Cheri and Craig asked Kayla why she had escalated the matter to ownership.

101. Cheri directed Kayla to submit her complaint in writing and provided her email address.

102. On or about October 28, 2025, at approximately 4:02 a.m., Kayla transmitted a six-page written complaint to General Manager Cheri by email.

103. That written complaint documented Joe’s sexually explicit remarks directed at Kayla.

104. That written complaint documented Joe’s sexually explicit remarks about female guests.

105. That written complaint documented Joe’s sexually explicit remarks regarding minors employed at the restaurant.

106. That written complaint was an act of opposition to sexual harassment.

107. Later that morning, at approximately 10:05 a.m., General Manager Cheri forwarded Kayla's written complaint to Erica.

108. Later that morning, Defendants terminated Joe’s employment.

109. Defendants terminated Joe's employment within hours of receiving Kayla's written complaint.

110. Later that morning, at approximately 11:53 a.m., Erica left Kayla a voicemail.

111. In that voicemail, Erica informed Kayla that Joe had been terminated.

112. In that voicemail, Erica thanked Kayla for reporting the issue.

113. At approximately 3:30 p.m., manager Craig and General Manager Cheri conducted a pre-shift meeting.

114. Craig and Cheri instructed staff not to contact human resources directly.

115. Craig and Cheri instructed staff not to contact ownership or upper management directly.

116. Craig and Cheri instructed staff to direct all concerns to Craig, Cheri, and Jeton.

117. Defendants' employee handbook directs employees who believe they have been subjected to harassment to "immediately notify Human Resources or any member of management."

118. Defendants' employee handbook states that the restaurant "prohibits retaliation against employees who, based on a reasonable belief, provide information about, complain, or assist in the investigation of any complaint of harassment or discrimination."

119. Defendants' employee handbook states that the restaurant "will promptly and thoroughly investigate any claim and take appropriate action where we find a claim has merit."

120. On or about October 29, 2025, Erica sent an email to Jessica Parker of Defendant Barbat Holdings LLC.

121. Erica copied Stoli Liti, an owner of Defendants, on that email.

122. In that email, Erica stated that Joe had been terminated after General Manager Cheri "received 3 complaint letters from female staff members about specific instances of sexual harassment."

123. In that email, Erica stated that Joe was continuing to contact Aurora On the Lake employees "to insist that Kayla (AOTL server) is the reason he was fired."

124. In that email, Erica stated that Joe "made it clear that he is obsessed with Kayla."

125. In that email, Erica stated that she had told Joe that his termination "was related to performance."

126. Erica informed Jessica Parker that Stoli Liti had called her regarding Joe's termination.

127. As of October 29, 2025, Defendants' human resources function, Defendant Barbat Holdings LLC, and at least one owner of Defendants knew that Kayla had reported Joe's sexual harassment.

128. On or about October 29, 2025, a negative online review targeting Kayla was posted.

129. Kayla had received no negative online reviews during her employment prior to that date.

130. On or about October 30, 2025, a second negative online review targeting Kayla was posted.

131. That review falsely accused Kayla of making racist statements toward guests.

132. Kayla reported the review to General Manager Cheri by text message.

133. Cheri told Kayla that she would not be terminated over a false review.

134. On or about November 1, 2025, Cheri informed Kayla that management and ownership had investigated the two reviews.

135. Cheri informed Kayla that no table matched the descriptions in the reviews.

136. Cheri informed Kayla that no reservation matched the names in the reviews.

137. Cheri informed Kayla that management believed the reviews had been posted by Joe.

138. In or about early November 2025, Jeton ceased speaking to Kayla.

139. In or about early November 2025, Jeton began controlling the assignment of guests to server sections.

140. In or about early November 2025, Kayla's guest counts declined.

141. In or about early November 2025, Kayla's gratuity income declined.

142. On or about November 6, 2025, a trainee working with Kayla observed, unprompted, that Kayla was being seated fewer guests than other servers.

143. On or about November 13, 2025, Kayla reported to General Manager Cheri by text message that Jeton was retaliating against her.

144. Kayla requested a schedule change so she would not work alone with Jeton.

145. Cheri agreed to move Kayla to Cheri's own schedule.

146. Defendants never implemented that schedule change.

147. On or about November 13, 2025, a host told Kayla that she had previously been near the top of the seating rotation and was now near the bottom.

148. Jeton reassigned Kayla to close the restaurant.

149. Jeton released Kayla's server assistant, increasing Kayla's workload.

150. In or about mid-November 2025, Jeton asked a coworker whether she had reported Joe to human resources.

151. Kayla reported that inquiry to General Manager Cheri.

152. In or about November 2025, Jeton berated a female coworker who had also reported Joe's conduct until she cried.

153. On or about November 22, 2025, Kayla met with General Manager Cheri regarding Jeton's conduct.

154. During that meeting, Kayla told Cheri that Jeton's retaliation against her for reporting sexual harassment was illegal.

155. During that meeting, Kayla told Cheri that Defendants had a legal obligation to protect her against the false reviews.

156. During that meeting, Kayla told Cheri that she had consulted an attorney.

157. During that meeting, Kayla requested permission to contact human resources representative Erica.

158. During that meeting, Cheri discouraged Kayla from contacting human resources.

159. During that meeting, Cheri stated that she and Erica were not on good terms.

160. During that meeting, Cheri disclosed to Kayla that Joe was Jeton's cousin.

161. On or about November 23, 2025, two additional false online reviews targeting Kayla were posted.

162. Management again acknowledged to Kayla that those reviews were false.

163. On multiple occasions in November 2025, Kayla asked Defendants to seek removal of the false reviews.

164. On at least two occasions, Kayla provided Defendants with instructions for requesting removal of the reviews.

165. Defendants never requested removal of the false reviews.

166. Defendants routinely requested removal of other negative online reviews concerning the restaurant.

167. On or about December 4, 2025, Kayla was seated approximately twelve (12) guests while a comparably situated server in an adjacent section was seated approximately twenty-five (25) guests.

168. Later that evening, a party seated in Kayla's section was reassigned to another server.

169. Later that evening, Kayla earned approximately $110.00 in gratuities.

170. Later that evening, Kayla met with General Manager Cheri and again reported Jeton's conduct.

171. On or about December 5, 2025, Jeton controlled the assignment of guests to server sections.

172. Later that evening, Kayla earned between approximately $160.00 and $190.00 in gratuities.

173. Later that evening, a host apologized to Kayla for her seating and stated that Jeton was controlling the door.

174. On or about December 6, 2025, Kayla again asked General Manager Cheri whether she had raised Jeton's conduct with ownership.

175. Kayla overheard General Manager Cheri state that she was "sick of all of her complaining."

176. On or about December 8, 2025, Kayla worked her final shift.

177. On or about December 10, 2025, at approximately 11:15 a.m., human resources representative Erica terminated Kayla's employment by telephone.

178. That telephone call lasted approximately one (1) minute.

179. During that call, Kayla twice asked for the reason for her termination.

180. During that call, Erica declined to provide a reason and stated that Defendants were not required to give one.

181. During that call, Erica stated that the termination followed company guidelines.

182. During that call, Erica stated that she did not have all of the details regarding the termination decision.

183. Defendants did not ask Kayla for her account of any alleged performance or conduct issue before terminating her employment.

184. Defendants did not conduct any investigation before terminating Kayla's employment.

185. On or about December 10, 2025, a host employed by Defendants authored a written complaint concerning Kayla.

186. That written complaint is dated December 10, 2025 — the same day Kayla was terminated.

187. On or about December 12, 2025, a second host employed by Defendants authored a written statement concerning Kayla.

188. That written statement is dated December 12, 2025 — two (2) days after Kayla was terminated.

189. Defendants subsequently represented to the Michigan Unemployment Insurance Agency that the second host statement had been submitted on October 18, 2025.

190. Upon information and belief, on or about December 14, 2025, Jeton told a coworker that Kayla had been terminated because of the online reviews.

191. Upon information and belief, Jeton told that coworker that management was upset that Kayla had gone to owner Lee Sharkas about Joe.

192. Upon information and belief, on or about December 30, 2025, General Manager Cheri told a coworker that Jeton had "pounced" on a guest complaint in order to obtain Kayla's termination.

193. Upon information and belief, Cheri stated that she had attempted to stop Kayla's termination.

194. On or about December 16, 2025, Kayla applied for unemployment benefits with the Michigan Unemployment Insurance Agency ("UIA").

195. On or about December 29, 2025, Erica certified to the UIA that the reason for Kayla's discharge was "At Will Employment."

196. Erica wrote on the same UIA form that Kayla was discharged for "Violation of company policy."

197. Erica certified to the UIA that the incident that caused Kayla's firing occurred on December 10, 2025.

198. Erica certified to the UIA that she was the person who fired Kayla.

199. On or about February 5, 2026, Erica certified to the UIA that Kayla was discharged for "Insubordination."

200. Erica certified to the UIA that Kayla had received verbal or written warnings before she was fired.

201. Defendants submitted a written statement to the UIA asserting that Kayla was discharged "after prior coaching and warnings."

202. Kayla never received a verbal or written warning from Defendants.

203. Defendants' written statement to the UIA asserted that Kayla had engaged in insubordination on August 7, 2025, by missing a shift.

204. Kayla was not scheduled to work on August 7, 2025.

205. Defendants' written statement to the UIA asserted that the customers who authored two negative reviews "were verified to have been served by Kayla."

206. Defendants' written statement to the UIA stated, "12/10/25 - Ownership asks that Kayla is terminated."

207. Upon information and belief, Kayla's termination was directed by one or more owners of Defendants.

208. On or about February 11, 2026, the UIA disqualified Kayla from unemployment benefits.

209. The UIA's determination stated that Kayla "had received past warnings."

210. Defendants have stated that Kayla was terminated for poor performance.

211. Defendants have stated that Kayla was terminated because of complaints by coworkers.

212. Defendants have stated that Kayla was terminated because of a guest complaint concerning draft beer.

213. Defendants' stated reasons for Kayla's termination are inconsistent with one another.

214. Defendants' stated reasons for Kayla's termination have no basis in fact.

215. Defendants' stated reasons for Kayla's termination did not actually motivate Kayla's termination.

216. Defendants' stated reasons for Kayla's termination were insufficient to warrant Kayla's termination.

217. Defendants' stated reasons for Kayla's termination are a pretext for unlawful retaliation.

218. Kayla's termination deprived her of her primary source of income.

219. Kayla exhausted her savings following her termination.

220. Kayla borrowed money from friends and family to pay her bills following her termination.

221. Following her termination, Kayla experienced prolonged sleeplessness.

222. Following her termination, Kayla experienced severe anxiety.

223. Following her termination, Kayla experienced humiliation as false rumors concerning the reasons for her termination circulated among coworkers and acquaintances.

## COUNT I — RETALIATION IN VIOLATION OF TITLE VII

224. Plaintiff realleges and reincorporates paragraphs 1-223 as if fully set forth herein.

225. Kayla engaged in protected activity under Title VII when she opposed sexual harassment in Defendants' workplace, including through her repeated reports to management, her October 27, 2025 escalation to ownership, her October 28, 2025 written complaint, and her November 2025 reports that she was being retaliated against for reporting sexual harassment.

226. Kayla held a sincere and objectively reasonable belief that the conduct she opposed violated Title VII.

227. Defendants, including their management, their human resources function, and their ownership, knew that Kayla had engaged in protected activity.

228. Defendants subjected Kayla to materially adverse actions, including the reduction of her guest assignments and gratuity income and the termination of her employment.

229. Defendants' materially adverse actions would have dissuaded a reasonable worker from making or supporting a charge of discrimination.

230. But for Kayla's protected activity, Defendants would not have taken those materially adverse actions.

231. Title VII imposed an obligation upon Defendants to refrain from retaliating against Kayla because of her protected activity.

232. Defendants willfully violated that obligation.

233. Defendants violated the aforementioned Title VII by, inter alia, the following acts:

a. Discharging Kayla because of her opposition to sexual harassment;

b. Reducing Kayla's guest assignments and gratuity income because of her opposition to sexual harassment;

c. Altering Kayla's work schedule and assignments because of her opposition to sexual harassment;

d. Refusing to seek removal of false online reviews that Defendants acknowledged were false;

e. Denying employment opportunities to Kayla because of her opposition to sexual harassment; and/or

f. Subjecting Kayla to disparate treatment because of her opposition to sexual harassment.

234. Defendants' retaliatory actions were willful, deliberate, and intentional.

235. The injuries to Plaintiff that arose as a consequence of Defendants' conduct were foreseeable and intentionally caused by Defendants.

236. As a direct and proximate result of the Defendants' violation of Title VII, Plaintiff suffered economic damages including but not limited to, loss of wages, loss of benefits, back pay, front pay, and other expenses.

237. As a direct and proximate result of Defendants' violation of Title VII, Plaintiff has suffered emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

238. As a direct, natural, proximate and foreseeable result of the actions of Defendants, Plaintiff has suffered injuries for which she is entitled to compensation, including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

239. The conduct of Defendants was so willful and wanton and performed with malice or reckless indifference to the statutory rights of Plaintiff that it entitles her to an award of punitive damages against Defendants to deter them and others from such conduct in the future.

240. Plaintiff is entitled to recover reasonable attorney's fees and litigation expenses pursuant to 42 U.S.C. § 2000e-5(k).

241. Plaintiff, having been retaliated against by Defendants, has suffered irreparable harm for which there is no plain, adequate, or complete remedy at law.

## COUNT II — RETALIATION IN VIOLATION OF THE ELCRA

242. Plaintiff realleges and reincorporates paragraphs 1-223 as if fully set forth herein.

243. Kayla engaged in protected activity under the ELCRA, MCL § 37.2701(a), when she opposed sexual harassment in Defendants' workplace, including through her repeated reports to management, her October 27, 2025 escalation to ownership, her October 28, 2025 written complaint, and her November 2025 reports that she was being retaliated against for reporting sexual harassment.

244. Kayla raised the specter of a discrimination complaint within the meaning of MCL § 37.2701(a).

245. Defendants, including their management, their human resources function, and their ownership, knew that Kayla had engaged in protected activity.

246. Defendants subjected Kayla to adverse employment actions, including the reduction of her guest assignments and gratuity income and the termination of her employment.

247. Kayla's protected activity was a significant factor in, and a but-for cause of, Defendants' decision to take those adverse employment actions.

248. Upon information and belief, manager Jeton Berisha, who bore animus toward Kayla because she reported his cousin's sexual harassment, exercised significant influence over the decision to terminate Kayla's employment.

249. The ELCRA imposed an obligation upon Defendants to refrain from retaliating against Kayla because of her protected activity.

250. Defendants willfully violated that obligation.

251. Defendants violated the aforementioned ELCRA by, inter alia, the following acts:

a. Discharging Kayla because of her opposition to sexual harassment;

b. Reducing Kayla's guest assignments and gratuity income because of her opposition to sexual harassment;

c. Altering Kayla's work schedule and assignments because of her opposition to sexual harassment;

d. Refusing to seek removal of false online reviews that Defendants acknowledged were false;

e. Denying employment opportunities to Kayla because of her opposition to sexual harassment; and/or

f. Subjecting Kayla to disparate treatment because of her opposition to sexual harassment.

252. Defendants' retaliatory actions were willful, deliberate, and intentional.

253. The injuries to Plaintiff that arose as a consequence of Defendants' conduct were foreseeable and intentionally caused by Defendants.

254. As a direct and proximate result of the Defendants' violation of the ELCRA, Plaintiff suffered economic damages including but not limited to, loss of wages, loss of benefits, back pay, front pay, and other expenses.

255. As a direct and proximate result of Defendants' violation of the ELCRA, Plaintiff has suffered emotional and physical distress, mental and physical anguish, loss of reputation, humiliation and embarrassment and the physical effects associated therewith, and will so suffer in the future.

256. As a direct, natural, proximate and foreseeable result of the actions of Defendants, Plaintiff has suffered injuries for which she is entitled to compensation, including, but not limited to, future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

257. Plaintiff is entitled to recover reasonable attorney's fees and litigation expenses pursuant to MCL § 37.2802.

258. Plaintiff, having been retaliated against by Defendants, has suffered irreparable harm for which there is no plain, adequate, or complete remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for damages in an amount to be determined at trial, together with interest, cost of suit, attorney's fees, and all such other relief as the court deems proper, which include:

a. Declare that the aforementioned practices and actions of Defendants constitute unlawful employment practices in violation of Title VII and the ELCRA;

b. Award Plaintiff all lost wages, past and future, and other monetary damages to which she is entitled, including interest under Title VII and the ELCRA;

c. Award Plaintiff compensatory damages under Title VII and the ELCRA;

d. Award Plaintiff punitive damages under Title VII;

e. Award Plaintiff exemplary damages under the ELCRA;

f. Award Plaintiff reasonable attorney's fees, costs, and interest under Title VII and the ELCRA;

g. Award Plaintiff equitable relief, including, but not limited to, an injunction directing Defendants to cease their retaliatory conduct and practices and injunctive relief directing Defendants to immediately provide all employees with a safe, non-discriminatory work environment under Title VII and the ELCRA; and

h. Award Plaintiff any other relief this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted October 6, 2026.

By: *<u>/s/ Warren D. Astbury</u>*
WARREN D. ASTBURY
ASTBURY LAW PLLC

Michigan Bar # P82416
607 Shelby St.
7th Floor, #1115
Detroit, MI 48226
Tel: (313) 701-2448
warren@astburylegal.com
Attorney for Plaintiff